UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID LEVERAGE, et al., | Case No. 16-cv-00784-KAW |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL** |
| TRAEGER PELLET GRILLS, LLC, et al., | Re: Dkt. No. 74 |
| Defendants. | |

Plaintiffs bring the instant putative class and collective action against Defendants Traeger Pellet Grills LLC and Xen 2, Inc., alleging violations of the Fair Labor Standards Act ("FLSA") and various state labor laws. (*See* Third Am. Compl. ("TAC"), Dkt. No. 51.) Pending before the Court is Plaintiffs' motion for preliminary approval of a settlement agreement between the parties. (Plfs.' Mot., Dkt. No. 74.) Upon consideration of the parties' filings, as well as the arguments presented at the June 15, 2017 motion hearing, and for the reasons set forth below, Plaintiffs' motion for preliminary approval is GRANTED.

## I.   BACKGROUND

### A.   Factual Background

Defendant Traeger manufactures and sells high-performance grills throughout the country. (TAC ¶ 13.) Defendant Xenium is a staffing agency who was Plaintiffs' W-2 employer for tax purposes. (TAC ¶ 8.) Through Defendant Xenium, Plaintiffs worked for Defendant Traeger as "Direct Sales Demonstrators," demonstrating Defendant Traeger's grills to the public. (TAC ¶ 13.) All Direct Sales Demonstrators were required to go through several days of training, referred to by Defendants as an "audition," in Utah. (TAC ¶ 18.) Some Plaintiffs were not paid for any regular or overtime for this training period. (*Id.*) Direct Sales Demonstrators were divided into three

groups: (1) the Wholesale Group (also known as "Brand Ambassadors"), (2) mall kiosk managers and assistant managers (also known as the "Mall Group"), and (3) the Direct Sales Group. (TAC ¶¶ 14, 16, 17.)

Brand Ambassadors worked in wholesale clubs such as Costco, setting up and manning a booth. (TAC ¶ 14.) Plaintiffs allege that Brand Ambassadors would "perform promotional activities within the booth, but would not make any actual sales, or receive any direct customer payments." (*Id.*) Plaintiffs also allege that they were typically required to work more than eight hours a day during these events, and that they were not allowed lunch breaks or rest breaks during the shows. (TAC ¶ 20.) Brand Ambassadors were routinely threatened with termination if they left the store for any non-emergency reason during store hours. (TAC ¶ 25.) Brand Ambassadors were purportedly required to set up the booth on the day prior to the show, which could take up to six hours, and breaking down the booth, which typically took at least four hours. (TAC ¶ 21.) They were not compensated for this time. Brand ambassadors were also not compensated for their travel time to and from Costco, although some travel expenses were reimbursed. (TAC ¶ 22.) Brand Ambassadors were not paid by the hour, but on commission; the commission was "based on a sliding percentage of the net amount of sales and returns of Traeger products during the roadshow after deducting amounts paid to Costco from the net amount of sales and returns." (TAC ¶ 14.) Plaintiffs assert that returns were not always individually tracked for commission payments, and that compensation could be reduced by returns from stock purchased before the road show had begun, or from other stores. Defendants would also deduct a flat 5% for anticipated returns in the future, but never rendered an accounting for actual returns. (*Id.*) Plaintiffs also allege that they were required to promote local dealers, but did not receive commissions for sales made by local dealers. (TAC ¶ 24.) Commissions generally varied from show to show, "but commonly amounted to less than minimum wage for time spent." (TAC ¶ 19.) Brand Ambassadors were also not offered any benefits including health insurance, sick days, and vacation days. (TAC ¶ 15.) Defendants, however, classified Brand Ambassadors as "exempt" under the FLSA and California labor law, using the "outside sales exemption." (TAC ¶ 26.)

The Mall Group worked at permanent kiosks within retail shopping centers. (TAC ¶ 17.)

1  Unlike Brand Ambassadors, the Mall Group received customer payments, and were paid based on

2  recoverable commission.  Plaintiffs allege that the Mall Group was classified as management

3  employees, treated as "exempt," and not paid overtime despite typically working in excess of

4  sixty-five hours per week.  (TAC ¶¶ 17, 35.)

5  Finally, the Direct Sales Group made direct sales at trade shows, fairs, expos, conventions,

6  and home shows.  (TAC ¶ 16.)  Like the Mall Group, the Direct Sales Group collected payment

7  directly from purchasing customers.  (*Id.*)

8  **B.  Procedural History**

9  On February 16, 2016, Plaintiffs filed the instant putative class and collective action

10  complaint for violation of various federal and California labor laws.  (Compl., Dkt. No. 1.)  On

11  March 25, 2016, Plaintiffs filed an amended complaint, adding additional claims under California

12  labor laws.  (First Amended Compl. ("FAC"), Dkt. No. 17.)  On May 26, 2016, the parties

13  stipulated to allow Plaintiffs to file a second amended complaint, which added an unlawful

14  deductions claim.  (Dkt. No. 37.)  On June 8, 2016, Plaintiffs filed their second amended

15  complaint.  (Second Amended Compl., Dkt. No. 39.)

16  On June 22, 2016, Defendants filed a motion, seeking dismissal pursuant to Federal Rules

17  of Civil Procedure 12(b)(3) based on improper venue, or, in the alternative, to transfer the case

18  pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Utah.  (Dkt.

19  No. 41.)  Defendants also sought dismissal under Rule 12(b)(6).  *Id.*  After Defendants' motion

20  was fully briefed, the parties stipulated to allow Plaintiffs to file the operative third amended

21  complaint, which added a new plaintiff.  (Dkt. No. 49.)  On October 4, 2016, Plaintiffs filed a

22  motion to conditionally certify a class under 29 U.S.C. § 216(b).  (Dkt. No. 56.)

23  On October 19, 2016, the Court filed an order, requiring supplemental briefing on

24  Defendants' motion to dismiss the case for improper venue or transfer to Utah.  (Dkt. No. 58.)

25  Specifically, the Court requested briefing on why the case should not be transferred to the Central

26  District or Eastern District of California, where the named Plaintiffs reside.  (*Id.*)  The following

27  day, the parties filed a stipulation to modify the supplemental briefing date so that they could

28  attend mediation.  (Dkt. No. 59.)  On October 28, 2017, the parties again stipulated to an extension

of the motion and hearing dates in order to continue settlement discussions.  (Dkt. No. 61.)

On December 6, 2017, the parties filed a notice of settlement, and requested that all pending hearings and deadlines be taken off-calendar.  (Dkt. No. 63.)  The parties also requested that the Court set a deadline for Plaintiffs to file their motion for preliminary approval.  Following a number of extensions, on April 7, 2017, Plaintiffs filed the instant motion for preliminary approval on April 7, 2017.  On April 14, 2017, Defendants filed a statement of non-opposition.  (Dkt. No. 75.)  On May 2, 2017, the Court issued an order requiring supplemental briefing on the motion for preliminary approval.  (Ord., Dkt. No. 76.)  On May 31, 2017, the parties filed a joint supplemental brief in support of the motion for preliminary approval.  (Supp. Brief., Dkt. No. 79.)

The Court held a hearing on Plaintiffs' motion for preliminary approval on June 15, 2017.  At the hearing, the parties agreed to make certain changes to the settlement agreement.  (Dkt. No. 83.)  On June 23, 2017, the parties filed a supplemental brief, which attached a revised settlement agreement and notices.  (Dkt. No. 84.)

### C.     Settlement Agreement

Under the terms of the settlement agreements, Defendants agree to pay a "Maximum Settlement Amount" of $2,850,000.  (Settlement Agreement ¶ 27.)  Of the Maximum Settlement Amount, Plaintiff's counsel intends to seek an award of 25%, or $712,500.00, as well as expenses not to exceed $60,000.  (*Id.* ¶ 19.)  The Maximum Settlement Amount also includes $65,000 in incentive payments to the named Plaintiffs,[1] and an estimated $35,000 for administration costs.[2]  (*Id.* ¶¶ 46.)  Finally, the Maximum Settlement Amount includes $66,666.67 in penalties under California's Private Attorneys General Act ("PAGA"); $50,000 shall be paid to the California Labor and Workforce Development Agency ("LWDA"), and $16,666.67 shall be distributed to California members based on the number of weeks each member worked in California between

---

[1] The proposed allocation is as follows: $20,000 to Plaintiff Lentini, $20,000 to Plaintiff Leverage, $10,000 to Plaintiff Dana, $10,000 to Plaintiff Benhardus, and $5,000 to Plaintiff Powell.  (Settlement Agreement ¶ 46.)

[2] At the hearing, the parties confirmed that this was a capped fee, and that the amount would not go above $35,000.  The parties also stated that if it did appear that the amount would go over $35,000, the parties would notify the Court and get approval.

February 16, 2015 and the date of preliminary approval.[3]  (*Id.* ¶ 34.)  This leaves a "Net Settlement

Amount" of $1,910,833.33 for distribution to an estimated 909 class members.  (Plfs.' Mot. at 19;

*see also* Settlement Agreement ¶¶ 27, 83.)

The Settlement provides for three classes: (1) the "California Class," which consists of

employees who worked for Defendants in California; (2) the "Non-California Rule 23 Class,"

which consists of employees who worked for Defendants in states outside of California[4] under

whose laws Plaintiffs have alleged state-law claims in the proposed Fourth Amended Complaint;

and (3) the "FLSA Class," which consists of employees who worked for Defendants in all other

states.  (Plfs.' Mot. at 2.)  The California Class and Non-California Rule 23 Class are opt-out

classes, while the FLSA Class is an opt-in class.  (Settlement Agreement ¶ 86a.)

Outside of California, the states are distributed into two tiers.  "Tier 1 States" are Arizona,

Colorado, Florida, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Nevada, New Mexico,

New York, Oklahoma, Oregon, and Washington.  (Settlement Agreement ¶ 49.)  Tier 1 States "are

states whose state law claims alleged in the Complaint (and released under the Settlement) afford

protections greater than the FLSA, but not as protective as California."  (Plfs.' Mot. at 3.)  "Tier 2

States" are all remaining states and the District of Columbia.  (Settlement Agreement ¶ 51.)  These

two tiers do not match up with the Non-California Rule 23 Class and the FLSA Class; the Non-

California Rule 23 Class includes states outside of the Tier 1 States.  (*See* Settlement Agreement

¶¶ 31 (listing states included in the Non-California Rule 23 Class), 49 (listing states included in

Tier 1).)

In distributing the Settlement fund, the Settlement Administrator is to calculate the "Base

Weekly Payment," which is based on the number of weeks worked by all participating class

members.  (Settlement Agreement ¶ 86(a).)  California Class members will receive a settlement

---

[3] On June 12, 2017, Plaintiffs filed a supplemental brief stating that the settlement agreement was submitted to the LWDA on April 10, 2017, but that they received no comments or communications from the LWDA since.  (Dkt. No. 81.)
[4] These states are: Arizona, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.  (Settlement Agreement ¶ 31.)

payment equal to 2.2 times the Base Weekly Payment, multiplied by the number of weeks worked by that individual. (*Id.* ¶ 86(b).) Individuals in Tier 1 States will receive a settlement payment equal to 1.3 times the Base Weekly Payment, multiplied by the number of weeks worked by that individual. (*Id.*) Finally, individuals in Tier 2 States will receive a settlement payment equal to the base Weekly Payment, multiplied by the number of weeks worked by that individual. The multiplier is based on the greater protections and remedies available to individuals who work in California and Tier 1 states. (*Id.*)

Once the Court grants preliminary approval, the Settlement Administrator is responsible for giving notice of the Settlement to the covered class members via e-mail and physical mail. (Settlement Agreement ¶ 70.) The Settlement Administrator will re-send notice packets that are returned as undelivered and bearing a forwarding address. As to notice packets that are returned as undelivered and not bearing a forwarding address, the Settlement Administrator will conduct a computer/SSN and "skip trace" search to find an updated address to mail the notice packet to. (*Id.*)

The California Class and Non-California Rule 23 Class are bound by the settlement unless they timely submit an exclusion letter. (Settlement Agreement ¶ 73.) If the submitted exclusion letter has any defects, the Settlement Administrator will advise the individual about the defects and request that those defects be cured. (*Id.* ¶ 73(f).) Failure to cure will result in the exclusion letter being considered invalid, and that individual will be bound by the settlement. (*Id.* ¶ 73(g).) Members of the FLSA Class must submit an opt-in form in order to participate in the settlement. (*Id.* ¶ 87.) Participating class members may also submit objections. (*Id.* ¶ 72.)

All California Class and Non-California Rule 23 Class members who do not timely opt out, as well as all individuals who opted into the FLSA Class, will receive a settlement check. (*Id.* ¶ 86a.) The settlement check will bear a disclaimer stating: "By cashing this check you are agreeing to the terms of the settlement reached in Leverage, et al. v. Traeger Pellet Grills LLC, et al. Case No. 16-cv-784 (N.D. Cal.) and are waiving any claims you may have under the Fair Labor Standards Act." (*Id.* (all caps omitted).) Cashing the settlement check will be deemed an opt-in for purposes of settling and releasing FLSA claims, as to California Class and Non-California

Rule 23 Class members. If California Class and Non-California Rule 23 Class members do not cash the settlement check, they will still be bound by the settlement and release their state claims, but not their FLSA claims. (*Id.*) Checks must be cashed within 180 days. (*Id.* ¶ 95.) The Settlement Administrator is responsible for mailing and e-mailing reminders to individuals who do not cash their checks 60 days before the checks become void. (*Id.* ¶ 96.) Pursuant to the parties' revised settlement agreement, the Court and the parties will determine if funds from uncashed checks should be redistributed to the participating class members on a pro rata basis, or if the funds should be sent to the *cy pres* beneficiary The Employee Rights Advocacy Institute for Law & Policy, "an organization that advocates for employee rights in the American workplace." (Revised Settlement Agreement ¶ 95, Dkt. No. 84-1.) No money reverts to Defendants.

As part of the settlement, Plaintiffs agree to file a Fourth Amended Complaint, which will add Mr. Tracy Powell as a named plaintiff and will add labor claims from the following states: Arizona, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. (Settlement Agreement ¶ 61; *see also* Settlement Agreement, Exh. A ("Proposed Fourth Amended Compl.") ¶ 1.) The Settlement Agreement will release: (1) "Released California Claims," or "any and all claims that were or could have been asserted under California law by California Class members based on the factual allegations in the Complaint, including but not limited to claims for unpaid overtime wages, unpaid minimum wages . . . , meal period premiums, rest period premiums, wage statement penalties, unlawful deductions from wages, waiting time penalties, civil penalties under the PAGA, and unfair competition under California Business & Professions Code § 17200;" (2) "Released FLSA Claims," or "any and all claims that were or could have been asserted under the Fair Labor Standards Act . . . by FLSA Class Members based on the factual allegations in the Complaint, including but not limited to claims for non-payment of wages, minimum wages, overtime wages; liquidated damages; attorney's fees, costs and expenses; pre- and post-judgment interest;" and (3) "Released Non-California Rule 23 Claims," or "any and

United States District Court
Northern District of California

all claims that were or could have been asserted under the wage and hour laws and regulations of all state laws (other than California) invoked in the [Fourth Amended] Complaint . . . and arising from the factual allegations in the Complaint, including all state or common law claims under the non-California wage and hour laws invoked in the [Fourth Amended] Complaint that could have been asserted by Covered Class Members based on the misconduct alleged in the complaint, including but not limited to claims for unpaid wages, attorneys' fees, costs and expenses; liquidated damages; civil penalties; equitable remedies; pre- or post-judgment interest; or damages or relief of any kind available under the non-California wage and hour laws invoked in the Complaint." (Settlement Agreement ¶¶ 40-42.) The released claims do not include claims for retaliation or violation of equal pay provisions. (*Id.*)

## II. LEGAL STANDARD

Per Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The purpose of requiring court approval "is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Thus, before approving a settlement, the Court must conclude that the settlement is "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). This inquiry:

> requires the district court to balance a number of factors: the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a government participant; and the reaction of the class members to the proposed settlement.

*Id.*; *see also Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (same).

Furthermore, the Ninth Circuit has recognized that where no class has been formally certified, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)

before securing the court's approval as fair." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) ("when . . . the settlement takes place before formal class certification, settlement approval requires a 'higher standard of fairness'"). This more "exacting review" is required "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*, 696 F.3d at 819 (internal quotation omitted); *see also Hanlon*, 150 F.3d at 1026 ("The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court[-]designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)").

When applying Rule 23(e), the courts use a two-step process for the approval of class action settlements. First, the Court decides whether the class action settlement deserves preliminary approval. Second, after notice is given to class members, the Court determines whether final approval is warranted. *See O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1121-22 (N.D. Cal. 2016). At the preliminary approval stage, courts in this district "have stated that the relevant inquiry is whether the settlement falls within the range of possible approval or within the range of reasonableness." *Cotter v. Lyft*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) (internal quotation omitted). "In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiff's expected recovery balanced against the value of the settlement offer." *Id.*; *see also O'Connor*, 201 F. Supp. 3d at 1122. This determination "requires evaluating the relative strengths and weaknesses of the plaintiffs' case; it may be reasonable to settle a weak claim for relatively little, while it is not reasonable to settle a strong claim for the same amount." *Cotter*, 176 F. Supp. at 936 (citing *In re High-Tech Emp. Antitrust Litig.*, Case No: 11-cv-2509-LHK, 2014 WL 3917126, at *4 (N.D. Cal. Aug. 8, 2014).

In addition to considering whether the settlement falls within the range of reasonableness, courts in this district also consider whether the settlement: "(1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; [and] (3) does not

9

improperly grant preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal quotation omitted). With respect to the level of scrutiny applied to this determination, "district courts often state or imply that scrutiny should be more lax." *Cotter*, 193 F. Supp. 3d at 1035-36. Several courts in this district have begun to question that "lax review" as "mak[ing] little practical sense." *Id.* at 1036. Instead, these courts suggest that "scrutinizing the agreement carefully at the initial stage and identifying any flaws that can be identified . . . allows the parties to decide how to respond to those flaws (whether by fixing them or opting not to settle) before they waste a great deal of time and money in the notice and opt-out process." *Id.*

## III. DISCUSSION

### A. Class and Collective Action Certification

#### i. Rule 23 "Opt-Out" Class Action

Before determining the fairness of a class action settlement, the Court must as a threshold matter "ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Hanlon*, 150 F.3d at 1019. The Court must also find that at least one requirement of Rule 23(b) is satisfied. *Id.* at 1022.

The Court finds that for the purposes of approval of the class action settlement, the Rule 23(a) requirements are satisfied. First, numerosity exists because the settlement class includes approximately 909 class members. *See Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012) ("While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not"). Second, commonality exists because there are "questions of fact and law which are common to the class," namely whether Defendants improperly classified the class members as "exempt," and failed to provide meal and rest periods, resulting in violations for waiting time and wage statement penalties. Fed. R. Civ. P. 23(a)(2); *see also Hanlon*, 150 F.3d at 1019-20 (noting that the commonality requirement is "permissive" and "has been construed permissively"). Third, typicality exists because the named Plaintiffs' claims are "reasonably co-

extensive with those of absent class members," as the named Plaintiffs were employed by Defendants in the same positions as the absent class members, and were subject to the same classification policies. *See Hanlon*, 150 F.3d at 1020. Finally, adequacy exists because there is no evidence that the named Plaintiffs and Plaintiffs' counsel have any conflicts of interest with the proposed classes, or that Plaintiffs and Plaintiffs' counsel will not vigorously prosecute the case on behalf of the classes. *See id.* ("Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?").

The Court also concludes that the Rule 23(b)(3) requirement is satisfied. Under Rule 23(b)(3), the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Here, the Court finds that predominance is satisfied because Plaintiffs' claims arise from Defendants' alleged policies of misclassifying workers as being "exempt," as well as policies of not providing meal and rest periods. Further, the Court finds that superiority is satisfied because the alternative method to a class action likely involves "individual claims for a small amount of . . . damages," resulting in most cases involving "litigation costs [that] dwarf potential recovery." *Hanlon*, 150 F.3d at 1023.

The Court therefore provisionally certifies the California Class and Non-California Rule 23 Class under Rule 23 for settlement purposes.

### ii. FLSA "Opt-In" Class

If an employer fails to comply with the FLSA, 29 U.S.C. § 216(b) allows an aggrieved employee to bring a collective action on behalf of herself and "similarly situated" employees. Most courts in this Circuit use a two-step approach for determining whether employees are similarly situated under § 216(b). At the first step, "the court determines whether the proposed class should be conditionally certified for the sole purpose of sending out notice of the proposed action to the potential class members." *Feaver v. Kaiser Found. Health Plan, Inc.*, Case No. 15-

cv-890-EMC, 2016 WL 324176, at *3 (N.D. Cal. Jan. 27, 2016). "The standard for the first step is a lenient one that typically results in certification." *Woods v. Vector Mktg. Corp.*, No. C-14-264-EMC, 2015 WL 1198593, at *3 (N.D. Cal. Mar. 16, 2015) (internal quotations and citations omitted). To satisfy this standard, the plaintiff must simply establish that an "identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA." *Russell v. Wells Fargo Co.*, No. C07-3993 CW, 2008 WL 4104212, at *5 (N.D. Cal. Sept. 3, 2008) (internal quotation omitted). At the second step, the party opposing certification moves to decertify the class after discovery is completed, at which point the Court makes factual determinations regarding the "propriety and scope" of the class. *Feaver*, 2016 WL 324176, at *4.

For purposes of approval of a FLSA settlement, courts in this district have applied the lenient first step standard. *E.g.*, *Viceral v. Mistras Grp., Inc.*, Case No. 15-cv-2198-EMC, 2016 WL 5907869, at *5 (N.D. Cal. Oct. 11, 2016) (applying the conditional certification standard and granting provisional certification of a FLSA class for approval of a settlement); *see also Bower v. Cycle Gear, Inc.*, Case No. 14-cv-2712-HSG, 2015 WL 13025767, at *1 (N.D. Cal. Dec. 8, 2015) (noting that the Court had previously conditionally certified a FLSA collective action in granting preliminary approval of a settlement agreement). Here, there is an identifiable factual and legal nexus that binds together the claims of the class, namely Defendants' alleged policies of misclassifying workers as being "exempt," as well as policies of not providing meal and rest periods. The Court therefore conditionally certifies the FLSA collective action for settlement purposes.

**B.    Preliminary Approval Factors**

**i.    Range of Reasonableness**

In considering whether the Settlement Agreement falls within the range of possible approval, the Court "primarily consider[s] plaintiffs' expected recovery balanced against the value of the settlement offer." *Viceral*, 2016 WL 5907869, at *7. Here, the Settlement Agreement results in a significant discount on the claims being released, as the "Maximum Settlement

Amount" of $2,850,000 represents approximately 18% of the potential "full-verdict value" of Plaintiffs' claims. Thus, the Settlement Agreement results in an 82% discount.[5]

Courts in this district have approved settlements with similar discounts, depending on the strength of the plaintiff's case and the risks in pursuing further litigation. *See Viceral*, 2016 WL 5907869, at *7 (approving case which represented 8.1% of the total verdict value). In the instant case, the parties have identified a number of risks that make the proposed settlement fall within a range of reasonableness.

### a. Misclassification

Significantly, the parties identify risks with Plaintiffs' underlying misclassification theory. Plaintiffs' lawsuit challenges Defendants' practice of classifying Brand Ambassadors as exempt under the "outside sales" exemption. Under federal law, an outside salesperson is exempt where the employee: (1) makes sales or "obtain[s] orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer," and (2) is customarily and regularly engaged away from the employer's place of business. 29 C.F.R. § 541.500(a). Under California law, an employee is considered an exempt outside salesperson if the person "customarily and regularly works more than half the time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services, or use of facilities." 8 C.C.R. § 11040(2)(M). Plaintiffs' misclassification theory turns on their arguments that: (1) workers are engaged in "promotional" rather than "sales" work, (2) Costco should be considered Defendant Traeger's "place of business," and (3) workers' hours and conduct were controlled to such an extent that it undermined their exempt status. (Supp. Brief at 5.)

With respect to the first argument, Plaintiffs face the risk that the Court could disagree that they were engaged in "promotional" rather than "sales" work, following *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012). There, the Supreme Court considered the definition of "sale," which was defined by the statute as "'any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.'" *Id.* at 2162 (quoting 29 U.S.C. §203(k).) The

---

[5] The Net Settlement Amount is $1,910,833.33, which represents approximately 12% of the estimated full verdict value, or an 88% discount.

Supreme Court rejected the Department of Labor's interpretation that a "sale" requires a transfer of title, finding that limiting the definition of "sale" to "contract[s] for the exchange of goods or services in return for value" would be "much too narrow." *Id.* at 2169, 2171. Instead, the Supreme Court noted that the definition of "sale" included "other disposition," a catchall phrase that "represent[s] an attempt to accommodate industry-by-industry variations in methods of selling commodities." *Id.* at 2171. The Supreme Court applied this understanding to the petitioners, who were pharmaceutical salespersons who would obtain nonbinding commitments from physicians to prescribe their employer's drugs. *Id.* at 2172. In finding that these salespersons fell within the exempt salesperson status, the Supreme Court reasoned that obtaining nonbinding commitments was the most that could be done given "the unique regulatory environment within which pharmaceutical companies must operate . . . ." *Id.* The Supreme Court also looked to other external indicia that supported a salesperson status, including that the petitioners were hired for their sales experience, were trained to obtain the maximum commitment possible, worked away from the office, had minimal supervision, and were rewarded with incentive compensation. *Id.* at 2172-73. While the Supreme Court did focus on the "unique regulatory environment" that the pharmaceutical salespersons were operating in, Plaintiffs in the instant case ran the risk that the Supreme Court's general reasoning could apply to their circumstance as well, which would result in Plaintiffs obtaining no or limited monetary relief.

Plaintiffs also ran the risk that a jury would find that they were not controlled to such an extent that it would undermine exempt status. While Plaintiffs allege that their hours and activities were controlled by Defendant Traeger, Defendants point to the fact that no Traeger employees were present to supervise Brand Ambassadors, and that there are other Brand Ambassadors who would dispute Plaintiffs' claim that breaks were discouraged or not allowed. (Supp. Brief at 9.) Such factual disputes create a risk of an adverse verdict. Defendants also argue that federal courts consider five factors which determine whether an employee is an outside salesperson, specifically: (1) whether the job was advertised as a sales position and the worker recruited based on sales experience; (2) whether the employee received specialized sales training; (3) whether compensation was based on commissions; (4) whether the employee independently

14

solicits new business; and (5) the level of supervision. *Barnick v. Wyeth*, 522 F. Supp. 2d 1257, 1262 (C.D. Cal. 2007). Defendants contend many of these factors support exempt status because: (1) the job was expressly advertised as an "Outside Sales Professional;" (2) applicants participated in 3- to 5-day trainings where they received specialized sales training; (3) compensation was based solely on commissions; (4) Brand Ambassadors could solicit new business by attending special events; and (5) Brand Ambassadors were not supervised while working at roadshows or special events. (Supp. Brief at 10.) This too created a significant risk that Plaintiffs would not be able to establish that they were misclassified, which would result in no or very limited class recovery.

Plaintiffs also challenge Defendants' policy of classifying the Mall Group as exempt. This too, ran significant risks. Under federal law, a commissioned employee working at a "retail or service establishment" who is paid on a commission basis does not need to be paid at an overtime rate if "[t]he 'regular rate' of such employee [is] more than one and one-half times the" applicable minimum wage, and more than half of his compensation in a "representative period" is commissions. 29 C.F.R. § 779.412. California law also provides for an inside sales exemption where an employee's earnings exceed one and one-half times the minimum wage if more than half that employee's compensation is made up of commissions. 8 C.C.R. § 11040(3)(D). Defendants argue that the Mall Group satisfies both requirements, a point that Plaintiffs do not appear to dispute.[6] (Supp. Brief at 11.)

In addition to risks on the merits, the parties point to risks with class certification on these issues, noting that there was "anticipated divergent testimony over the *nature* of putative class members' job duties and the reasonable expectations of the job." (Supp. Brief at 13.) As noted by the Ninth Circuit, "the fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) (internal quotation omitted). Using the federal

---

[6] In their complaint, Plaintiffs did not identify the legal basis underlying the exempt status for Mall Group workers, stating that "the exact rationale for the classification is unknown to Plaintiffs." (TAC ¶ 38.)

outside salesperson exemption as an example, the Ninth Circuit observed that even if there was a uniform exemption policy, "courts must still ask where the individual employees actually spent their time." *Id.*; *see also Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946-47 (9th Cir. 2009) (agreeing with district court decision to not certify a class, finding that the "[p]laintiffs' claims will require inquiries into how much time each individual [consultant] spent in or out of the office and how the [consultant] performed his or her job; all of this where the [consultant] was granted almost unfettered autonomy to do his or her job," and that this could result in "several hundred mini-trials with respect to each [consultant]'s actual work performance"). These risks of certification being denied were not minimal.

### b. Specific Violations

Even if Plaintiffs succeeded in certifying the misclassification question and establishing that they were misclassified, Plaintiffs faced other risks. For example, with respect to Plaintiffs' meal and rest period claims, Plaintiffs confirmed at the hearing that their claim was based solely "on an <u>unwritten</u> policy/practice of discouraging meal and rest periods," which Defendants were prepared to counter with testimony from other putative class members stating that there was no such policy and that they were free to take meal and rest periods. (Supp. Brief at 15.) Plaintiffs submit that such "testimony would be difficult to overcome, particularly given that Plaintiffs and other putative class members generally were not supervised directly by any Traeger employee, and . . . were typically working independently." (*Id.*)

As to Plaintiffs' derivative California waiting time and wage statement penalties, the parties dispute whether non-California class members would be entitled to such penalties. (*Id.* at 19.) While there is California Supreme Court authority that held that California's overtime laws apply to nonresident workers temporarily in California who are employed by California employers, that same authority observed that the assumption that "if out-of-state employers must pay overtime under California law, they must also comply with every other technical aspect of California wage law" as being "of doubtful validity." *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1202 (9th Cir. 2011). As applied in this case, where Defendants are not California employers, there is risk to Plaintiffs that non-California class members would not be able to obtain waiting

time and wage statement penalties.  Moreover, even if non-California class members could obtain penalties, waiting time and wage statement penalties are available only in the absence of a "good faith dispute" as to whether wages are owed.  *See Woods v. Vector Mktg. Corp.*, No. C-14-264-EMC, 2015 WL 2453202, at *2-5 (granting summary judgment to the employer on the penalty claims because there was a good faith dispute as to whether such wages were owed, such that the plaintiffs could not as a matter of law establish a "knowing and intentional" violation of § 226 (wage statement penalties) and a "willful" violation of § 203 (waiting time penalties)).  Thus, there were substantial risks of no recovery to any Plaintiffs on the penalty claims, which altogether were estimated to be worth over $4.4 million, or approximately one-fourth of the full verdict value. (*See* Plfs.' Mot. at 14-15; Ord. at 3.)

In addition, Defendants point to possible overestimating of the damages, which lowers the value of the claims even if Plaintiffs were to succeed on the merits.  (*See* Supp. Brief at 14 (arguing that Plaintiffs overestimated the overtime damages by 15-20%); 17 (arguing that Plaintiffs overestimated the minimum wage claim by 33%).

In total, given the risks both to the underlying misclassification theory and the specific claims themselves, the Court finds that the proposed settlement -- which represents 18% of the estimated full verdict value -- falls within the range of reasonableness.  This factor thus weighs in favor of preliminary approval.

### ii. Serious, Informed Negotiations

Next, the Court considers how the parties arrived at the settlement, specifically whether the settlement was "the product of an arms-length, non-collusive, negotiated resolution."  *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 965 (9th Cir. 2009).  Here, the parties' settlement was conducted after Defendants provided extensive payroll records, schedules, class numbers, total commissions, locations worked, employee handbooks, wage and hour policies, and other records and data to Plaintiffs' counsel, which allowed Plaintiffs' counsel to evaluate the claims on a class wide basis. (Haines Decl. ¶ 11, Dkt. No. 74-1.)  After this production, the parties attended mediation with Mr. Mark S. Rudy, during which each party "supplied Mr. Rudy with detailed mediation statements outlining their views of the strengths and weaknesses of each claim and defense." (Haines Decl. ¶

12.)  Although the parties did not resolve the case at mediation, they continued their settlement discussions and ultimately agreed, in principle, to the instant agreement, with the help of a formal mediator's proposal from Mr. Rudy.  (*Id.*)  The Court finds that the parties reached the settlement via an arms-length, non-collusive, negotiated resolution, and that this factor weighs in favor of preliminary approval.

       **iii.    No Obvious Deficiencies**

In its order for supplemental briefing, the Court raised concerns about the *cy pres* beneficiary, the amount of attorney's fees and incentive payments, and the objection procedures.

First, as to the *cy pres* beneficiary, the Court questioned whether the parties' original selection of The Road Home -- a Utah-focused organization -- was appropriate, given the Ninth Circuit's requirement that a *cy pres* distribution "must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their *geographic diversity*."  *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) (emphasis added).  At the hearing, the parties agreed to select The Employee Rights Advocacy Institute for Law & Policy as an alternative *cy pres* beneficiary, which is reflected in the revised settlement agreement.  (*See* Revised Settlement Agreement ¶ 95.)  The Court finds that selection of this alternative is appropriate.

The Court also questioned whether uncashed settlement funds should be donated to the *cy pres* beneficiary, rather than being distributed to the class if that amount was significant, *i.e.*, over $100,000.  (Ord. at 5.)  The parties responded that such a redistribution could result in a "windfall to certain class members," but did not explain how.  (Supp. Brief at 25.)  At the hearing, the parties proposed that following final approval, the parties would provide a declaration which explains how many checks were uncashed.  Based on the amount, the parties and the Court could then decide if a redistribution was appropriate, or if the amount should go to the *cy pres* beneficiary.  The parties have reflected this change in the revised settlement agreement.  (Revised Settlement Agreement ¶¶ 86a, 95.)

Second, the Court raised concerns about the amount of the attorney's fees and incentive payments.  With regard to the attorney's fees, Plaintiffs assert that their lodestar to date is

approximately $474,000.  (Supp. Brief at 1.)  As Plaintiffs' counsel intends to seek $712,500, this represents an approximately 1.5 multiplier on the lodestar.  (*See* Plfs.' Mot. at 19.)  The Court has some concerns over whether such a multiplier is warranted given that the settlement represents approximately 18% of the full verdict value, but will reserve this consideration for Plaintiffs' motion for attorney's fees.  *See Viceral*, 2016 WL 5907869, at *10 ("while the Court has serious concerns about the fee award, the requested award is not a basis for denial of settlement approval at this juncture.  The motion for fees will be dealt with at the appropriate time").  Likewise, the Court will review the incentive payments at the final approval stage; the Court notes, however, that other courts in this Circuit have raised concerns where an incentive award consisted of one percent of the common fund.  *Ontiveros v. Zamora*, 303 F.R.D. 356, 365-66 (E.D. Cal. 2014) ("A $20,000 incentive award consisting of one percent of the common fund is unusually high, and some courts have been reluctant to approve incentive awards constituting such a great portion of the common fund"); *Ko v. Natura Pet Prods., Inc.*, No. C 09-2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (reducing requested incentive award of $20,000 to $5,000).

Third, the Court raised concerns regarding objections to the Settlement Agreement.  The parties have modified the notices to indicate that objections should be submitted to the Settlement Administrator, rather than the Court, and that these objections should be filed with the Court no later than fourteen days before the hearing.  (Supp. Brief at 30; *see also* Supp. Haines Decl., Exhs. 2-A at 6, 3-A 6, Dkt. No. 79-1.)  In addition, the Court requested further briefing on whether it was appropriate to, for class action members who submitted both an objection and an opt-out, disregard the opt-out and consider only the objection.  (Ord. at 7.)  The parties proposed "remov[ing] this language from the Notice altogether, and to deal with any objection/opt-out on a case-by-case basis by having the Settlement Administrator contact the Settlement Class member to determine whether the Settlement Class members wishes [sic] (a) for the objection to be heard or (b) to exclude himself/herself from the settlement."  (Supp. Brief at 32.)  This change is reflected in the revised settlement agreement and the class action notice.  (Revised Settlement Agreement ¶ 73; Dkt. No. 84-3 at 6.)

The Court also questioned language in the FLSA notice, which states: "If you submit an

19

objection, you will remain bound by the settlement if finally approved. If you do not want to be bound by the settlement if finally approved, you must not opt in or object to the settlement." The Court asked why an objection should be deemed to be an opt-in to the collective action. (Ord. at 8.) In their supplemental brief, the parties stated that this sentence "does not transform an objection into an FLSA opt-in," but "simply reiterates to potential FLSA Class members that they may not object to the Settlement unless they opt-in to the FLSA collective action, and that, if they so object and their objection is overruled, they will still be deemed an FLSA opt-in and will remain a part of (and bound by the releases in) the FLSA collective action settlement." (Supp. Brief at 33.) At the hearing, the Court proposed modifying the language to state: "If you opt-in and submit an objection, you will still remain bound by the settlement if finally approved. If you do not want to be bound by the settlement if finally approved, you must not opt in to the settlement." The parties agreed to the change, and modified the FLSA notice accordingly. (*See* Dkt. No. 84-5 at 6.)

The Court finds that the parties' changes have addressed the Court's main concerns, and thus this factor weighs in favor of preliminary approval.

### iv. Preferential Treatment

Finally, the Court considers whether the Settlement Agreement provides preferential treatment to any class members. The Court concludes that the Settlement Agreement does not. Although the Settlement Agreement provides for multipliers depending on if individuals worked in California or certain other states, those multipliers reflect the additional claims -- and thus, the additional value of those claims -- that the class members are releasing as part of this Settlement. The parties have also adequately explained the rationale for the multipliers, which is based on the value of the claims depending on whether the individual worked a particular work week in California, a Tier 1 State, or a Tier 2 State. (Supp. Briefing at 22-23.) Moreover, although individuals in Tier 2 States do not receive a multiplier, despite releasing claims under state statutes, those state statutes do not provide additional protections beyond those offered by the FLSA, such that the release of those claims would not require a multiplier. (*Id.* at 23.) Thus, the proposed multipliers do not result in preferential treatment, but instead reflect the different values

of the claims at issue, and this factor weighs in favor of preliminary approval.

### v. Notice Procedure

The Court has reviewed the content of the proposed notices, including the redline changes submitted with the parties' supplemental brief, and finds that they are adequate to inform the putative class and collective action members of the terms of the Settlement Agreement and their ability to object. (*See* Dkt. No. 84.) The Court therefore approves the proposed notice procedures.

### IV. CONCLUSION

The Court finds that based on the above factors, preliminary approval is warranted, subject to the additional changes to the notices being made. The Court therefore GRANTS preliminary approval of the parties' proposed Settlement Agreement, including the provisional certification of the class and collective action, as well as the filing of the proposed Fourth Amended Complaint. Plaintiffs shall file the proposed Fourth Amended Complaint on the docket as a separate entry. The Court APPOINTS, for settlement purposes only, David Leverage, Michael Lentini, Peter Dana, Chris Benhardus, and Tracy Powell as class representatives; Haines Law Group, APC and Kilgore & Kilgore, PLLC as class counsel; and Simpluris, Inc. as Settlement Administrator. The Court APPROVES the notice provided by the parties. (*See* Dkt. No. 84.) The Court sets the following schedule:

///

///

///

///

///

///

///

///

///

///

///

| Action: | Date: |
|---|---|
| Defendants to provide Class Member list to Settlement Administrator | 7 business days from the date of this order |
| Settlement Administrator to mail Notice Packets | 10 business days after receiving Class Member List |
| Class Counsel to file Motion for Attorney's fees, costs, and class representative service awards | 14 days before Response Deadline |
| Deadline for Class Members to opt-in (FLSA class members), opt-out (California and Non-California Rule 23 class members), and/or object to the Settlement Agreement | 60 days after mailing of Notice Packets |
| Plaintiffs to file Motion for Final Settlement Approval | October 12, 2017 |
| Final Approval Hearing | November 16, 2017 at 11:00 a.m. |

        IT IS SO ORDERED.

Dated: June 28, 2017

_KANDIS A. WESTMORE_
United States Magistrate Judge