UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID LEVERAGE, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>TRAEGER PELLET GRILLS, LLC, et al.,<br><br>    Defendants. | Case No. 16-cv-00784-KAW<br><br>**ORDER GRANTING MOTION FOR FINAL APPROVAL; GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES, COSTS, AND INCENTIVE AWARDS**<br><br>Re: Dkt. Nos. 90, 96 |

Plaintiffs filed the instant putative class and collective action against Defendants Traeger Pellet Grills LLC and Xen 2, Inc., alleging violations of the Fair Labor Standards Act ("FLSA") and various state labor laws. (*See* Fourth Am. Compl. ("FAC"), Dkt. No. 86.) The parties subsequently settled the case, and on June 28, 2017, the Court preliminarily approved the proposed settlement and directed that notice be sent to the class and collective action members. (Preliminary Approval Order, Dkt. No. 85.) Pending before the Court is: (1) Plaintiffs' motion for final approval of the settlement; and (2) Plaintiffs' motion for attorney's fees, costs, and class representatives' incentive payments. (Mot. for Final Approval, Dkt. No. 96; Mot. for Atty's Fees, Dkt. No. 90.) Both motions are unopposed. (Dkt. Nos. 94, 97.)

Upon consideration of the parties' filings, as well as the arguments presented at the December 14, 2017 motion hearing, and for the reasons set forth below, Plaintiffs' motion for final approval is GRANTED, and Plaintiffs' motion for attorney's fees, costs, and class representatives' incentive payments is GRANTED IN PART and DENIED IN PART.

# I. BACKGROUND

## A. Factual Background

Defendant Traeger manufactures and sells high-performance grills throughout the country. (FAC ¶ 13.) Defendant Xenium is a staffing agency who was Plaintiffs' W-2 employer for tax purposes until December 2013. (FAC ¶ 8.) Through Defendant Xenium, Plaintiffs worked for Defendant Traeger as "Direct Sales Demonstrators," demonstrating Defendant Traeger's grills to the public. (FAC ¶ 13.) All Direct Sales Demonstrators were required to go through several days of training, referred to by Defendants as an "audition," which some Plaintiffs were not paid for. (FAC ¶ 18.) Direct Sales Demonstrators were divided into three groups: (1) the Wholesale Group ("Brand Ambassadors"), (2) mall kiosk managers and assistant managers ("Mall Group"), and (3) the Direct Sales Group. (FAC ¶¶ 14, 16, 17.)

Brand Ambassadors were classified as "exempt" workers under the "outside sales exemption." (FAC ¶ 26.) They worked in wholesale clubs such as Costco, setting up and manning a booth. (FAC ¶ 14.) Plaintiffs allege that Brand Ambassadors would "perform promotional activities within the booth, but would not make any actual sales, or receive any direct customer payments." (*Id.*) They were allegedly required to work more than eight hours a day during these events, and were not allowed lunch breaks or rest breaks during the shows. (FAC ¶ 20.) Brand Ambassadors were also purportedly required to set up and break down the booth, which they were not compensated for. (FAC ¶ 21.) Brand Ambassadors were also not compensated for travel time, although some travel expenses were reimbursed. (FAC ¶ 22.) Brand Ambassadors were not paid by the hour, but on a commission "based on a sliding percentage of the net amount of sales and returns of Traeger products during the roadshow after deducting amounts paid to Costco from the net amount of sales and returns," including a flat 5% withholding. (FAC ¶ 14.) Plaintiffs assert that the deducted amounts did not account for actual returns. Commissions generally varied, "but commonly amounted to less than minimum wage for time spent." (FAC ¶ 19.) Brand Ambassadors were also not given benefits such as health insurance, sick days, and vacation days. (FAC ¶ 15.)

The Mall Group worked at permanent kiosks within retail shopping centers. (FAC ¶ 17.)

Unlike Brand Ambassadors, the Mall Group received customer payments, and was paid based on recoverable commission. Plaintiffs allege that the Mall Group was classified as management employees, treated as "exempt," and not paid overtime. (FAC ¶¶ 17, 35.)

Finally, the Direct Sales Group made direct sales at trade shows, fairs, expos, conventions, and home shows. (FAC ¶ 16.)

### B. Procedural History

On February 16, 2016, Plaintiffs filed the instant putative class and collective action complaint for violation of various federal and California labor laws. (Compl., Dkt. No. 1.) On March 25, 2016, Plaintiffs filed an amended complaint, adding additional claims under California labor laws. (First Amended Compl., Dkt. No. 17.) On June 8, 2016, Plaintiffs filed a second amended complaint adding an unlawful deductions claim. (Dkt. No. 37; Second Amended Compl. ("SAC"), Dkt. No. 39.)

On June 22, 2016, Defendants filed a motion, seeking to dismiss based on improper venue, or, in the alternative, to transfer the case to Utah. (Dkt. No. 41.) Defendants also sought dismissal under Rule 12(b)(6). *Id.* On October 4, 2016, Plaintiffs filed a motion to conditionally certify a class under 29 U.S.C. § 216(b). (Dkt. No. 56.)

On October 19, 2016, the Court required supplemental briefing on why the case should not be transferred to the Central or Eastern District of California, where the named Plaintiffs reside. (Dkt. No. 58.) The following day, the parties stipulated to modify the supplemental briefing date so that they could attend mediation. (Dkt. No. 59.)

On December 6, 2016, the parties filed a notice of settlement, and requested that all pending hearings and deadlines be taken off-calendar. (Dkt. No. 63.) On April 7, 2017, Plaintiffs filed their unopposed motion for preliminary approval on April 7, 2017. (Dkt. Nos. 74, 75.) On May 2, 2017, the Court issued an order requiring supplemental briefing on the motion for preliminary approval. (Ord., Dkt. No. 76.) On May 31, 2017, the parties filed a joint supplemental brief in support of the motion for preliminary approval. (Supp. Brief., Dkt. No. 79.)

The Court held a hearing on Plaintiffs' motion for preliminary approval on June 15, 2017. At the hearing, the parties agreed to make certain changes to the settlement. (Dkt. No. 83.) After

the parties filed a revised Settlement Agreement with the requested changes, the Court granted preliminary approval. (*See* Dkt. No. 84; Preliminary Approval Ord. at 1.)

### C. Settlement Agreement

Under the terms of the approved Settlement Agreement, Defendants agree to pay a "Maximum Settlement Amount" of $2,850,000. (Settlement Agreement ¶ 27, Dkt. No. 84-1.) Of the Maximum Settlement Amount, Plaintiff's counsel seeks an attorney's fee award of 25%, or $712,500.00, as well as expenses not to exceed $60,000. (*Id.* ¶ 19.) The Maximum Settlement Amount also includes $65,000 in incentive payments to the named Plaintiffs,[1] and $35,000 for administration costs. (*Id.* ¶¶ 46.) The Maximum Settlement Amount includes $66,666.67 in penalties under California's Private Attorneys General Act ("PAGA"); $50,000 shall be paid to the California Labor and Workforce Development Agency ("LWDA"), and $16,666.67 shall be distributed to California members based on the number of weeks each member worked in California between February 16, 2015 and the date of preliminary approval. (*Id.* ¶ 34.) This leaves a "Net Settlement Amount" of $1,910,833.33 for distribution to an estimated 909 class members. (Settlement Agreement ¶¶ 27, 83.)

The Settlement provides for three classes: (1) the "California Class," which consists of employees who worked for Defendants in California; (2) the "Non-California Rule 23 Class," which consists of employees who worked for Defendants in states outside of California under whose laws Plaintiffs have alleged state-law claims in the proposed Fourth Amended Complaint; and (3) the "FLSA Class," which consists of employees who worked for Defendants in all other states. (Plfs.' Mot. at 2.) The California Class and Non-California Rule 23 Class are opt-out classes, while the FLSA Class is an opt-in class. (Settlement Agreement ¶ 86a.)

Outside of California, the states are distributed into two tiers. "Tier 1 States" include states whose state laws afford greater protections than the FLSA, although not as protective as California. "Tier 2 States" are all remaining states and the District of Columbia. (Settlement

---

[1] The proposed allocation is as follows: $20,000 to Plaintiff Lentini, $20,000 to Plaintiff Leverage, $10,000 to Plaintiff Dana, $10,000 to Plaintiff Benhardus, and $5,000 to Plaintiff Powell. (Settlement Agreement ¶ 46.)

Agreement ¶ 51.) These two tiers do not match up with the Non-California Rule 23 Class and the FLSA Class; the Non-California Rule 23 Class includes states outside of the Tier 1 States. (*See* Settlement Agreement ¶¶ 31, 49).)

Distribution of the settlement fund is centered on the "Base Weekly Payment," which is based on the number of weeks worked by all participating class members. (Settlement Agreement ¶ 86(a).) California Class members will receive a settlement payment equal to 2.2 times the Base Weekly Payment, multiplied by the number of weeks worked by that individual between February 16, 2012 and the date of preliminary approval. (*Id.* ¶ 86(b).) Individuals in Tier 1 States will receive a settlement payment equal to 1.3 times the Base Weekly Payment, multiplied by the number of weeks worked by that individual between February 16, 2013 and the date of preliminary approval. (*Id.* ¶ 86(c).) Individuals in Tier 2 States will receive a settlement payment equal to the base Weekly Payment, multiplied by the number of weeks worked by that individual between February 16, 2013 and the date of preliminary approval. The multipliers are based on the greater protections and remedies available to individuals who work in California and Tier 1 states.

The California Class and Non-California Rule 23 Class are bound by the settlement unless they timely opt out. (Settlement Agreement ¶ 73.) Members of the FLSA Class must opt in to participate in the settlement. (*Id.* ¶ 87.) Participants will receive a settlement check that bears a disclaimer stating: "By cashing this check you are agreeing to the terms of the settlement reached in Leverage, et al. v. Traeger Pellet Grills LLC, et al. Case No. 16-cv-784 (N.D. Cal.) and are waiving any claims you may have under the Fair Labor Standards Act." (*Id.* ¶ 86a (all caps omitted).) Cashing the settlement check will be deemed an opt-in for purposes of settling and releasing FLSA claims, as to California Class and Non-California Rule 23 Class members. If California Class and Non-California Rule 23 Class members do not cash the settlement check, they remain bound by the settlement and release their state claims, but not their FLSA claims. (*Id.*) Following distribution, the Court and the parties will determine if funds from uncashed checks should be redistributed to the participating class members on a pro rata basis, or if the funds should be sent to the *cy pres* beneficiary The Employee Rights Advocacy Institute for Law & Policy. (Settlement Agreement ¶ 95.) No money reverts to Defendants.

As part of the settlement, Plaintiffs agreed to file a Fourth Amended Complaint, which will add Mr. Tracy Powell as a named Plaintiff and will add labor claims from additional states.[2] (Settlement Agreement ¶ 61.) The Settlement Agreement will release: (1) "Released California Claims," or "any and all claims that were or could have been asserted under California law by California Class members based on the factual allegations in the Complaint, including but not limited to claims for unpaid overtime wages, unpaid minimum wages . . . , meal period premiums, rest period premiums, wage statement penalties, unlawful deductions from wages, waiting time penalties, civil penalties under the PAGA, and unfair competition under California Business & Professions Code § 17200;" (2) "Released FLSA Claims," or "any and all claims that were or could have been asserted under the Fair Labor Standards Act . . . by FLSA Class Members based on the factual allegations in the Complaint, including but not limited to claims for non-payment of wages, minimum wages, overtime wages; liquidated damages; attorney's fees, costs and expenses; pre- and post-judgment interest;" and (3) "Released Non-California Rule 23 Claims," or "any and all claims that were or could have been asserted under the wage and hour laws and regulations of all state laws (other than California) invoked in the [Fourth Amended] Complaint . . . and arising from the factual allegations in the Complaint, including all state or common law claims under the non-California wage and hour laws invoked in the [Fourth Amended] Complaint that could have been asserted by Covered Class Members based on the misconduct alleged in the complaint, including but not limited to claims for unpaid wages, attorneys' fees, costs and expenses; liquidated damages; civil penalties; equitable remedies; pre- or post-judgment interest; or damages or relief of any kind available under the non-California wage and hour laws invoked in the Complaint."[3] (Settlement Agreement ¶¶ 40-42.)

---

[2] These states are Arizona, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

[3] The released claims do not include retaliation or equal pay violations. (Settlement Agreement ¶¶ 40-42.)

## II. LEGAL STANDARD

In deciding whether a settlement agreement is fair, adequate, and reasonable to all concerned, the Court considers the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

The Ninth Circuit also counsels that while "strong judicial policy favors settlements, the settlement may not be the product of collusion among the negotiating parties." *Churchill Vill., LLC*, 361 F.3d at 576 (internal quotation and modification omitted). Further, when a settlement agreement is negotiated prior to formal class certification, the Court must be particularly vigilant for signs of collusion, as "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Such signs include: (1) counsel receiving a disproportionate distribution of the settlement, or where a class receives no monetary distribution but class counsel is amply rewarded; (2) where the parties negotiate a "clear sailing" arrangement for the payment of attorney's fees separate and apart from class funds; and (3) where there is a reversion of fees to the defendants. *Id.* at 947.

## III. DISCUSSION

### A. Final Approval

The Court finds that the *Churchill* factors support final approval of the Settlement.

First, as noted in the Court's preliminary approval order, Plaintiffs' case was not strong. While the Settlement Agreement results in an 82% discount of Plaintiffs' estimated "full-verdict value," this deep discount was an acknowledgment of the serious risks that Plaintiffs would not succeed on their misclassification theory. (Preliminary Approval Ord. at 13-15.) A finding that Plaintiffs were not misclassified would "result in no or very limited class recovery." (*Id.* at 15.) Further, there was a risk that Plaintiffs would not be able to obtain class certification based on their misclassification theory, given the "anticipated divergent testimony over the *nature* of

7

putative class members' job duties and the reasonable expectations of the job." (*Id.*; *see also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) ("the fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties").) Plaintiffs also faced risks on merits of the specific violations alleged, including whether class members were actually able to take meal and rest breaks, whether non-California class members would be entitled to California waiting time and wage statement penalties, and whether damages had been overestimated. (Preliminary Approval Ord. at 16-17.) In light of the substantial risks in both the threshold misclassification question and the merits of the individual claims, the Court finds that the first *Churchill* factor favors final approval.

Second, in the absence of settlement, this case would likely be subject to significant further litigation. In addition to the parties' dispute on the merits, there was a pending motion on whether the case was brought in the proper forum, such that both parties faced significant motion practice moving forward. The Court concludes that the second *Churchill* factor of the risk, expense, complexity, and duration of further litigation favors final approval.

Third, Plaintiffs faced a risk that they would not be able to obtain and maintain class certification. Again, the parties acknowledged that there would likely be "divergent testimony over the *nature*" of the workers' job duties and reasonable expectations, such that class certification was not guaranteed. (*See* Preliminary Approval Ord. at 15.) This factor favors final approval.

Fourth, the amount offered by the Settlement, while a deep discount from the estimated full-verdict value, takes into account the significant risks discussed above and in the preliminary approval order. Further, although not a formal part of the settlement, Plaintiffs assert that this litigation has resulted in non-monetary relief, including the discontinuation of the 5% withholding from the commission calculation and the hiring of Brand Ambassadors as full-time regular employees. (Dkt. No. 79 at 4.) Defendants have also begun to pay Brand Ambassadors a salary for their first ten weeks prior to being placed on commission, addressing Plaintiffs' claim that workers were not paid during their training period. (*Id.*) The Court finds that this factor also

8

favors final approval.

Fifth, Plaintiffs assert that the parties have engaged in substantial investigation, informal discovery, and data analysis in reaching the Settlement. (Mot. for Final Approval at 9.) As the Court previously found, the parties' settlement was conducted after Defendants provided payroll records, schedules, class numbers, total commissions, locations worked, employee handbooks, wage and hour policies, and other records to Plaintiffs' counsel, allowing Plaintiffs' counsel to evaluate the claims on a class-wide basis. (Preliminary Approval Ord. at 17; *see also* Dkt. No. 74-1 ¶ 11.) The Court concludes that the discovery conducted was adequate to allow the parties to make a fully informed decision on settlement. Thus, this factor favors final approval.

Sixth, Class Counsel supports the Settlement as fair. (Mot. for Final Approval at 9-10.) Further, Class Counsel is experienced in this area; the primary attorneys in this case have significant experience in wage and hour class actions. (*See* Haines Decl. ¶¶ 2-3, 6, Dkt. No. 90-1; Korobkin Decl. ¶¶ 2, 4, Dkt. No. 90-2; Crouch Decl. ¶¶ 2, 11-26, Dkt. No. 90-3.) Class Counsel's experience and support for the Settlement favors final approval.

Seventh, notice of the settlement was provided to the LWDA, as well as the Class Action Fairness Act ("CAFA") notice to all applicable state officials. No government entity has lodged an objection to the settlement. The Court finds that this *Churchill* factor favors final approval.

Finally, the reaction of the class members to the proposed settlement has been positive. Per the settlement administrator, the class list included 840 Rule 23 Class Members and 56 FLSA Class Members. (Gomez Decl. ¶ 7, Dkt. No. 96-2.) Of these 896 individuals, eighteen notice packets were undeliverable, although these eighteen individuals received e-mail notice. (Gomez Decl. ¶ 11.) 14 FLSA Class Members ultimately opted in, and no Rule 23 Class Member has asked to be excluded. (Gomez Decl. ¶¶ 14, 19.) Further, as of October 30, 2017, the settlement administrator has received no objections, and there are no outstanding disputes about the payment amounts. (Gomez Decl. ¶¶ 20-21.) At the hearing, Plaintiffs' counsel confirmed that no objections or opt-outs had been received. Given that no Rule 23 Class Member has opted out of the suit and no individual has objected, this last *Churchill* factor favors final approval.

In addition to the *Churchill* factors, the Court finds that the *Bluetooth* factors are satisfied,

9

such that there is no evidence of collusion. Specifically, Class Counsel is not receiving a disproportionate distribution of the settlement, there is no "clear sailing" arrangement, and none of the Settlement Amount reverts back to Defendants.

Thus, having reviewed both the *Churchill* and *Bluetooth* factors, the Court finds that the Settlement is fair, adequate, and reasonable. Accordingly, the Court GRANTS Plaintiffs' motion for final approval.

### B. Attorney's Fees and Costs

"[T]he court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Ninth Circuit has found, however, that courts still "have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941. Where a settlement, such as this one, "produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Id.* at 942. Under the percentage method, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award . . . ." *Id.*

Here, Class Counsel seeks 25% of the common fund, or $712,500. (Mot. for Atty's Fees at 1, 7.) The Court finds that this request is reasonable, given that Class Counsel seeks the benchmark amount and that no Class Member has objected to the proposed fee award. This case was also extremely risky for Class Counsel. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). Further, while again the Settlement amount represents a deep discount, Plaintiffs point out that this case has resulted in changes to Defendants' employment practices, including the discontinuation of the 5% withholding, the hiring of Brand Ambassadors as full-time regular employees, and the payment of a salary during the first ten weeks. (*Id.*) While not a part of the Settlement Agreement, such changes benefit both current and future employees, which also highlights the work Class Counsel has performed in this case. *See Vizcaino*, 290 F.3d at 1050 ("Incidental or non-monetary benefits conferred by the litigation are a relevant circumstance"). The Court concludes that under the percentage method, the attorney's fees requested is reasonable.

The Court also applies the lodestar method as a cross-check on the percentage method.

Class Counsel asserts the following hourly rates and hours billed through September 2017:

| Attorney: | Hourly Rate: | Hours Billed: | Total: |
|---|---|---|---|
| Paul K. Haines | $575 | 308 | $177,100.00 |
| Tuvia Korobkin | $450 | 422 | $189,900.00 |
| John H. Crouch | $350 | 298.10 | $104,335.00 |
| Christine A. Hopkins | $300 | 115.10 | $34,530.00 |
| Paralegal (Haines Law Group) | $175 | 25.2 | $4,410.00 |
| Legal Assistant (Kilgore & Kilgore) | $75 | 18.2 | $1,365.00 |
| | | | $511,640.00 |

Class Counsel has also provided billing records. For the period of September 15, 2017 through November 20, 2017, attorneys at Kilgore & Kilgore, PLLC have spent an additional $2,030 in attorney's fees. (Dkt. No. 101-4, Exh. A at 25-26.) For the period of September 23, 2017 through October 29, 2017, attorneys at Haines Law Group, APC have spent an additional $8,355. (Dkt. No. 101-1, Exh. A at 34-35.) Not including expected fees from appearing at the final approval hearing, and additional time spent by Haines Law Group, APC attorneys for the period in November, Class Counsel's stated lodestar is approximately $522,025; the requested $712,500 represents an approximately 1.36 multiplier.

The Court finds that the lodestar appears reasonable. First, the billing rates are reasonable; Class Counsel has substantial experience in employment class action litigation, and the rates fall within the *Laffey* matrix. (Mot. for Atty's Fees at 20; Haines Decl. ¶ 18, Exh. C; *see also* Crouch Decl. ¶ 29.) More importantly, Class Counsel has been awarded the requested rates in recent cases. (Haines Decl. ¶ 16; Korobkin Decl. ¶ 4; Crouch Decl. ¶ 28.) Second, the Court has reviewed the billing records, and finds that the time spent on this case is not excessive.

The 1.36 multiplier also appears reasonable, although a closer call. Again, the Settlement Agreement represents an 82% discount from the estimated full verdict value. While Class Counsel argues that the result achieved is good and warrants a multiplier due to the significant risks involved, other courts in this district have cautioned against such rationale. *See Viceral v. Mistras Grp., Inc.*, Case No. 15-cv-2198-EMC, 2016 WL 5907869, at *10 (N.D. Cal. Oct. 11, 2016) ("Counsel argues that the fee award is justified because, given the facts of the case, which

11

overwhelmingly favored [Defendant], there was substantial risk to pursuing litigation, and thus *any* recovery was a significant success. But this rationale would have the perverse effect of rewarding counsel for taking on weak or otherwise dubious cases. Under this reasoning, the worse the case, the higher the risk, and thus, the higher the acceptable fee multiplier"). The Court ultimately finds that the lodestar cross-check is satisfied in light of the non-monetary relief achieved by this litigation, even if this relief was not part of the Settlement Agreement. Such relief still stems from the efforts of Class Counsel, and better justifies the amount sought.

Applying the percentage method, as cross-checked by the lodestar method, the Court finds that the attorney's fees sought by Class Counsel is reasonable. The Court therefore GRANTS Plaintiffs' request for an award of attorney's fees in the amount of $712,500.00.

### C. Attorney's Costs

Plaintiffs seek $49,439.16 in costs actually incurred. (Mot. for Atty's Fees at 21.) These costs include filing fees, mediation costs, travel expenses, expert fees, legal research, and copying and postage. (Haines Decl., Exh. B; Dkt. No. 101-4, Exh. A at 26-27.) Defendant does not oppose Class Counsel's request. The Court finds that the costs requested were reasonably incurred, and GRANTS Plaintiffs' request for costs in the amount of $49,439.16.

### D. Administrator's Costs

Plaintiffs seek $35,000 for the Settlement Administrator's costs. (Mot. for Atty's Fees at 21.) This was the amount agreed to by the parties, and the costs actually incurred by the Settlement Administrator. (Gomez Decl. ISO Mot. for Atty's Fees ¶ 22, Dkt. No. 90-4.) The Court finds that this amount is reasonable, and GRANTS Plaintiffs' request for settlement administration costs.

### E. Incentive Awards

Finally, Plaintiffs request incentive payments of $20,000 each to Plaintiffs Leverage and Lentini, $10,000 each to Plaintiffs Benhardus and Dana, and $5,000 to Plaintiff Powell. (Mot. for Atty's Fees at 22.) Incentive payments to named plaintiffs are "fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). "Such awards are discretionary, and are intended to compensate class representatives for works done on behalf of the class, to

make up for financial or reputational risk undertaken in bringing the action." *Id.* (internal citation omitted). "Several courts in this District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount." *Harris v. Vector Mktg. Corp.*, Case No. 08-cv-5198-EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012). In *Ko v. Natura Pet Products, Inc.*, the district court rejected the requested award of $20,000 for a plaintiff who had spent approximately 50 to 100 hours on the case. No. C 09-2619-SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012). The district court explained that the "$20,000 incentive payment is quite high for this district," and concluded that the requested award was excessive. Instead, the district court awarded the standard $5,000, noting that the named plaintiff would "still be compensated handsomely for her time; the $5,000 award results in either a $100 or $50 hourly rate for the 50-100 hours Plaintiff expended on this case." *Id.* In *Ontiveros v. Zamora*, the district court likewise rejected a $20,000 incentive award that would have compensated the named plaintiff at a $73.80 hourly rate, instead awarding a $50 hourly rate. 303 F.R.D. 356, 366 (E.D. Cal. 2014). In justifying this downward departure, the district court explained that "[o]vercompensating named plaintiffs at the expense of a reduction in the common fund available to class []members could encourage collusion at the settlement stage of class actions where a named plaintiff's interest naturally diverges from that of the class, compromising his role as a judge of adequacy." *Id.*

Here, most of the amounts requested are far greater than the presumptively reasonable $5,000 award in this district. The Court, however, finds that most of the requested amounts are reasonable.

First, Plaintiff Leverage requests $20,000, based on over 400 hours of work on this case. (Mot. for Atty's Fees at 23.) This includes time spent researching state law and the FLSA, speaking to thirty of Defendant Traeger's workers as potential witnesses, listening to and analyzing phone meetings conducted by Defendant Traeger, speaking to Class Counsel, and gathering documents in connection with discovery and preparation of preliminary motions. (Leverage Decl. ¶¶ 26-30, Dkt. No. 90-5.) A $20,000 award would result in an approximately $50 hourly rate. Class Counsel also notes that the motion for conditional certification included

13

hundreds of pages of exhibits, drawn exclusively from documents, information, and testimony provided by the named Plaintiffs, including Plaintiff Leverage. (Mot. for Atty's Fees at 24.) Given the amount of time spent, which likely reduced the amount of attorney time spent on conducting discovery and investigation of the case merits, the Court GRANTS Plaintiffs' request for a $20,000 incentive award to Plaintiff Leverage.

Second, Plaintiff Lentini requests $20,000, based on more than 600 hours of work. (Mot. for Atty's Fees at 23.) His work included researching the law, locating counsel, contacting approximately eighty of Defendant Traeger's prior and current employees to gather evidence and seek potential witnesses, travelling to Stockton, California to research a state court case against another Costco vendor with similar employee practices, attending mediation, communicating with Class Counsel and other named Plaintiffs or potential witnesses, turning over approximately 2,500 pages of documents, and sorting and listening to approximately 225 hours of phone meetings conducted by Defendant Traeger. (Lentini Decl. ¶¶ 32-41, Dkt. No. 90-6.) A $20,000 award would result in an approximately $33.33 hourly rate. The Court GRANTS Plaintiffs' request for a $20,000 incentive award to Plaintiff Lentini.

Third, Plaintiff Dana requests $10,000, based on more than 200 hours of work. (Mot. for Atty's Fees at 23.) Plaintiff Dana's work included gathering and reviewing correspondence received from Defendant Traeger, listening to sales calls and training videos, discussing the case with other named Plaintiffs, introducing Plaintiff Lentini to former Defendant Traeger employees to gather evidence, attending mediation, and communicating with Class Counsel. (Dana Decl. ¶¶ 20-24, Dkt. No. 90-7.) A $10,000 award would result in an approximately $50 hourly rate. The Court GRANTS Plaintiffs' request for a $10,000 incentive award to Plaintiff Dana.

Fourth, Plaintiff Benhardus requests $10,000, based on approximately 100 hours of work. (Mot. for Atty's Fees at 23.) Plaintiff Benhardus's work includes thirty-six hours reviewing approximately 500 e-mails from Defendant Traeger, three hours preparing his original declaration in support of the motion for conditional certification and opposition to the motion to dismiss, twenty hours speaking with other Mall Group managers, twenty hours communicating with Class Counsel, and fifteen to twenty hours communicating with the other named Plaintiffs. (Benhardus

14

Decl. ¶¶ 35-39.)

Even assuming 100[4] hours of work, a $10,000 award would result in an approximately $100 hourly rate. This is a significantly greater rate than those requested by the other named Plaintiffs.[5] The work performed by Plaintiff Benhardus is also substantially less than the work performed by both Plaintiff Dana (who performed more than 200 hours of work) and Plaintiff Powell (who performed more than 400 hours of work). Under these circumstances, the Court finds that it would not be fair to the other named Plaintiffs to award Plaintiff Benhardus an incentive award that is disproportionate to the amount of work performed.

At the hearing, Class Counsel argued that the work performed by the named Plaintiffs was significantly greater than that performed by named plaintiffs in other cases. Class Counsel did not, however, suggest that the work performed by Plaintiff Benhardus, in particular, was significantly greater or more helpful than the work performed by the other named Plaintiffs in this case, such that Plaintiff Benhardus should be awarded an hourly rate that is double the next lowest rate requested by the other named Plaintiffs. Class Counsel also argues that even with the $10,000 incentive award, Plaintiff Benhardus is receiving less than the amount of some of the unnamed Plaintiffs. (*See* Supp. Gomez Decl. ¶ 3 (stating that with a $10,000 incentive award, Plaintiff Benhardus's total settlement payment would be $16,828.92); Gomez Decl. ¶ 17 (stating that the highest estimated payment is $18,170.48).[6]) Class Counsel provides no authority that the purpose of an incentive award is to guarantee that a named Plaintiff receives more than unnamed class members; instead, the purpose of an incentive award is to compensate for work performed and to make up for financial or reputational risks undertaken in bringing an action. The fact that a named

---

[4] Plaintiff Benhardus provides a range of hours spent communicating with other named Plaintiffs; using the lower end of that range, Plaintiff Benhardus would have spent 94 hours on this case. Based on 94 hours, a $10,000 award would result in a $106.38 hourly rate.

[5] While the *Ko* plaintiff received an hourly rate between $50 and $100, the *Ko* plaintiff only received $5,000, the presumptively reasonable amount in this district. Here, Plaintiff Benhardus is seeking an amount twice the standard amount.

[6] The supplemental declaration was filed on December 14, 2017 by Class Counsel after the hearing on the motion, to provide further justification for awarding the unusually high incentive award to Plaintiff Benhardus.

1  Plaintiff is receiving less than an unnamed Plaintiff -- who is settling a significantly larger claim --
2  is not a legitimate reason for granting an incentive award that is greater than the standard $5,000
3  amount, and disproportionate to the incentive awards granted for other named Plaintiffs.
4  Accordingly, the Court DENIES Plaintiffs' request for a $10,000 award for Plaintiff Benhardus as
5  unreasonable. Instead, the Court AWARDS Plaintiff Benhardus $5,000 -- a $50 hourly rate -- as
6  this amount will sufficiently compensate him for his time and the reputational and financial risks
7  undertaken by being a named plaintiff.

8  Finally, Plaintiff Powell requests $5,000, based on more than 400 hours of work. (Mot. for
9  Atty's Fees at 23-24.) Plaintiff Powell's work includes speaking with other Mall Group managers,
10 and communicating with Class Counsel and the other named Plaintiffs. The Court finds that the
11 $5,000 is reasonable, especially in light of the amount of work performed by Plaintiff Powell.
12 Accordingly, the Court GRANTS Plaintiffs' request for a $5,000 award for Plaintiff Powell.

### IV.    CONCLUSION

For the reasons stated above, the Court: (1) GRANTS Plaintiffs' request for final approval of the settlement; (2) GRANTS Plaintiffs' request for attorney's fees in the amount of $712,500; (3) GRANTS Plaintiffs' request for litigation costs in the amount of $49,439.16; (4) GRANTS Plaintiffs' request for $35,000 in administration costs to the Settlement Administrator; (5) GRANTS Plaintiffs' request for a $20,000 incentive award for Plaintiff Leverage; (6) GRANTS Plaintiffs' request for a $20,000 incentive award for Plaintiff Lentini; (7) GRANTS Plaintiffs' request for a $10,000 incentive award for Plaintiff Dana; and (8) GRANTS Plaintiffs' request for a $5,000 incentive award for Plaintiff Powell. The Court DENIES Plaintiffs' request for a $10,000 incentive award for Plaintiff Benhardus and, instead, awards Plaintiff Benhardus $5,000.

IT IS SO ORDERED.

Dated: December 15, 2017

*Kandis Westmore*
KANDIS A. WESTMORE
United States Magistrate Judge